**Opinion issued July 25, 2019**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-18-00590-CV

———————————

## IN THE MATTER OF X.D.

On Appeal from the 323rd District Court
Tarrant County,[1] Texas
Trial Court Case No. 323-106412-17

## MEMORANDUM OPINION

Appellant, X.D., a juvenile, appeals the trial court's finding that he engaged in delinquent conduct by committing the penal offense of arson. In two issues, X.D. contends that the evidence identifying him as the perpetrator of the arson is

---

[1]     The Texas Supreme Court transferred this appeal from the Court of Appeals for the Second District of Texas. *See* TEX. GOV'T CODE ANN. § 73.001 (authorizing transfer of cases between courts of appeals).

insufficient to support the trial court's judgment, and the trial court erred in admitting impermissibly suggestive photo array evidence.

We affirm.

## Background

On the morning of Friday, December 1, 2017, just before the 8:10 bell was to ring to begin the school day, the fire alarm sounded at Irma Marsh Middle School in Castleberry Independent School District in River Oaks, Texas. Assistant Principals Arnulfo Martinez and Ruben Brown saw that smoke was filling the first-floor sixth-grade hallway. After acting to ensure that the building was fully evacuated, they returned to the sixth-grade hallway in search of the source of the smoke.

Martinez and Brown discovered a fire burning in the sixth-grade boys' bathroom. Martinez observed that "what looked like a toilet paper roll" had been placed underneath the partition of a handicap stall and lit on fire. The fire had spread to the partition and toilet paper dispenser, and then to the handicap railing inside the stall.

Martinez and Brown described the fire as "intense" and the smoke as "thick," so much so that they had difficulty breathing. Martinez put the fire out with a fire extinguisher. Afterwards, he had a headache and some difficulty

2

breathing, and Brown's "back began to burn quite a bit" and he felt "really lightheaded" and "faint."

Michael Rehfeld, a fire investigator with the Tarrant County Fire Marshal, was dispatched to the school to investigate. He testified that he arrived on the scene around 8:30 or 9:00 a.m. to discover burned sanitary napkin pads, a burned toilet paper roll, and a melted plastic toilet paper roller in the handicap stall of the boys' bathroom. Rehfeld gave school administrators a "wanted poster" and asked them to display it. According to Rehfeld, the fire was caused by a person or persons connecting an open flame with a combustible material.

Officer Tony Provencio, Castleberry I.S.D. Police Department Chief of Police, also testified as to the events of the morning of December 1, 2017. He stated that he was notified at 8:14 a.m. that the school's fire alarm had sounded. When he arrived on the scene, he learned that the fire had been extinguished. He did not enter the building because it was too dark with smoke, and "inhaling that was kind of too much without equipment." After confirming that everyone was out of the building and the fire department had been called, Provencio spoke with Martinez and Brown, who relayed the events of the morning. Because there were no leads at that time, Provencio left the scene.

Shortly after the students returned to the school building, written and verbal statements about the cause of the fire began to "flood" in. Of the approximately

3

100 student statements submitted that day, Martinez and Brown found only two—written by sixth-grade students I.R. and M.R.—to be credible.

In her statement, I.R. wrote that earlier that morning, before classes had begun, she and M.R. went to the sixth-grade girls' bathroom. On leaving, they "were walking and [they] saw [X.D.] and [J.M.]"[2] The girls "watched [X.D.] light the lighter," and then they "ran" to class. "[T]hen 5 seconds later the fire alarm went of[f] and we had to go outside but when we were leaving the theater room we saw [X.D.] run[.] [H]e lit a fire cracker."

M.R. wrote that she was with I.R., G., and G.'s friend outside the sixth-grade bathrooms when she saw X.D. in the boys' bathroom with "a lighter in his hand." X.D. was there with J.M. and "they both had paper rolled up and the light turned on and it burned[. S]o me and [I.R.] ran back to class and when I was going to tell [the teacher] the fire alarm went off." She added, "They lit up fire crackers[. T]hey pop loud."

Three days later, I.R. wrote a second statement. In it, she stated that she and M.R. "were walking out [of the girls' bathroom] when we heard laughing and we went to head to class and we looked inside [the boys' bathroom] to see what was happening so then we saw [X.D.] and [J.M.]. [X.D.] had the lighter . . . and [J.M.]

---

[2]    The sixth-grade boys' and girls' bathrooms are adjacent, and the doors to both are kept open.

was saying light it up light it light it and it was a purple paper . . . and we walked away and like 5 seconds later there was a fire drill."

That same day, a school administrator contacted Officer Provencio to inform him that I.R. and M.R. had witnessed the incident. Provencio went to the school to investigate. After reviewing their written statements, he interviewed I.R. and M.R. each separately. Provencio testified that he found them both to be credible and that their verbal accounts of the incident corroborated their written statements.

Officer Provencio testified that he then prepared a photo array to administer to I.R. and M.R. The seven photos Provencio selected for the array included four former and current students within Castleberry I.S.D. as well as X.D. and J.M., and another Irma Marsh Middle School student, A.G., who had been rumored to have been involved. Provencio testified that he determined that A.G. was not involved in starting the fire before including him in the array.

Officer Provencio stated that, in selecting the photos, he "tried to make it to where some of these even appear to look like the suspects." And he explained that he chose seven photographs for the array because that was the standard number, based on his past experience. When asked why he put both of the suspects in the array, Provencio answered that he thought that the possibility that the witnesses would identify "one and not another" would make it "a lot harder."

5

Officer Provencio testified that he asked Assistant Principal Brown to conduct the identification procedure. When defense counsel asked why he did not conduct it himself, Provencio explained that he did not want to "make it seem like [he] was trying to influence the witnesses to point out the suspects" and that he felt it would be better for I.R. and M.R., because of their age, if it was conducted by someone with whom they felt comfortable.

On December 6, Brown, after being given "specific instructions" by Officer Provencio, presented the photo array to I.R. and M.R. Brown met with each girl separately. Both witnesses identified the individuals in place number seven (X.D.) and place number four (J.M.) as the perpetrators of the arson. They also filled out school district photo lineup forms, on which they indicated that the individuals in place numbers four and seven had committed the crime. In the space on the form where the witnesses were asked to state their level of certainty, I.R. wrote "I'm pretty sure but not 100% sure," and M.R. wrote "I'm 100% sure it is number 7. And I kind of think it's 4."

Officer Provencio testified that shortly after I.R. and M.R. identified X.D. from the photo array, he arrested X.D. During its direct examination of Provencio, the State offered the photo array as Exhibit 27, M.R.'s photo lineup form as Exhibit 28, and I.R.'s photo lineup form as Exhibit 29 ("the photo array evidence") into evidence. Counsel for X.D. objected:

6

I'm going to object, Your Honor. They're improper photo lineups. They weren't done correctly. They're not supposed to have seven people. You're not supposed to have multiple people [suspects] in the same lineup. So I'm going to object to anything as far as the photo lineup goes.

The trial court admitted the exhibits.

I.R. also testified at trial. She stated that on the morning of the fire, she and M.R. visited the bathroom before class was to begin. They saw two boys standing behind something in the boys' bathroom and heard "a lot of laughter" One of the boys was J.M. One boy had a lighter and the other had a purple paper. "They were lighting the paper," and she saw the paper catch fire. She and M.R. then went to their classroom, where they heard the fire alarm sound.

Later that day, I.R. and several other students, including M.R., "went to the office and wrote the statement." I.R. testified that M.R. told her to write the color of the paper because at the time she didn't remember that it was purple. When asked whether she had written anything untrue in her December 1 statement, she answered, "The fire cracker."

I.R. further testified that she told a police officer that X.D. and J.M. started the fire and that she identified X.D. from the photo array as one of the boys who started the fire. She also explained that she had written "pretty sure but not a hundred percent" on her photo lineup form "[b]ecause [she] didn't remember."

7

And she stated that Officer Provencio told her about a reward for information, but that she "didn't want the money."

On cross-examination, I.R. testified that she knew J.M. but not X.D. She did not remember telling "the DAs" that there were four boys in the bathroom but stated that there could have been four. She did not remember saying that X.D. was holding the lighter, but she did remember saying that M.R. told her the color of the paper.

M.R.'s testimony was much the same as I.R.'s. She stated that she was with I.R. when she heard giggling coming from the boys' bathroom, where she saw X.D. and J.M. At first, she testified that one boy had a lighter and the other had paper. Later in her testimony, she testified that X.D. was holding purple construction paper and the lighter. She "saw a little click," but did not see a flame, and she and I.R. ran back to the classroom, where she heard the fire alarm. When reminded that she had written in her statement that G. and his friends were with her and I.R. outside the boys' bathroom, she remembered that they were.

With regard to the photo array, M.R. stated that she was "one hundred percent sure" about X.D. and "kind of certain but confused a little" about J.M. She did not remember the fire crackers she had mentioned in her statement.

On cross-examination, M.R. remembered telling Brown that she learned X.D.'s name after seeing his picture and hearing his name the Wednesday after the

8

fire. She also stated that she learned about the reward after making her written statement and that, as she had mentioned to the prosecutors, I.R. wanted her to lie to the police so that I.R. could get the reward.

Allison Ward, one of X.D.'s teachers, testified that X.D. was a student in her first period reading class. She stated that X.D. was in her classroom when the fire alarm sounded just before the 8:10 a.m. bell was scheduled to ring. She also testified that it would take "a minute or two" to walk from her classroom to the bathroom.

The trial court found that X.D. engaged in delinquent conduct by committing arson.[3] *See* TEX. FAM. CODE ANN. § 51.03(a)(1) (providing that delinquent conduct includes "conduct, other than a traffic offense, that violates a penal law of this state or of the United States punishable by imprisonment or by confinement in jail"); TEX. PENAL CODE ANN. § 28.02(a)(2)(A) ("A person commits [arson] if the person starts a fire . . . or causes an explosion with intent to destroy or damage . . . any building . . . knowing that it is within the limits of an incorporated city or town."). The trial court found the arson to be a first-degree felony because it caused Martinez and Brown bodily injury and further found that X.D. used a deadly weapon—"a combustible or flammable liquid or material, that in the manner of its use or intended use was capable of causing death or serious bodily injury"—in its

---

[3]     X.D. waived his right to a jury trial.

commission. *See* TEX. PENAL CODE ANN. § 28.02(d)(1) (providing that arson is first-degree felony if "bodily injury or death was suffered by any person by reason of the commission of the offense"). It then sentenced X.D. to two years' probation.

X.D. appeals the trial court's judgment of delinquency.

## Sufficiency of the Evidence

In his first issue, X.D. argues that the evidence was insufficient to identify him as the perpetrator of the arson.

## A.    Standard of Review and Applicable Law

Although juvenile-court proceedings are considered civil cases, they are quasi-criminal in nature. *In re Hall*, 286 S.W.3d 925, 927 (Tex. 2009); *see* TEX. FAM. CODE ANN. § 51.17(a) (stating when Texas Rules of Civil Procedure and Texas Code of Criminal Procedure apply in juvenile-court proceedings). We use criminal-law standards to review the sufficiency of the evidence to support a judgment of juvenile delinquency. *In re D.A.K.*, 536 S.W.3d 845, 847 (Tex. App.—Houston [1st Dist.] 2017, no pet.). In conducting a sufficiency review, we view all the evidence in the light most favorable to the trial court's judgment to determine whether any rational factfinder could have found the essential elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Lucio v. State*, 351 S.W.3d 878, 894 (Tex. Crim. App. 2011). On review, appellate courts defer to the factfinder "to resolve any conflicts in the testimony, to weigh the evidence, and

10

to draw reasonable inferences from basic facts to ultimate facts." *Jackson v. Virginia*, 443 U.S. 307, 319; *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). The factfinder is the sole judge of the weight and credibility of the evidence after drawing reasonable inferences from the evidence. *Adames v. State*, 353 S.W.3d 854, 860 (Tex. Crim. App. 2011); *see also Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (reviewing court must defer to factfinder to resolve conflicts, weigh evidence, and draw reasonable inferences). Where, as here, the case is tried to the bench, the trial court sits as the sole factfinder, and it alone assesses the credibility of the witnesses and decides how much weight to give each witness's testimony. *Joseph v. State*, 897 S.W.2d 374, 376 (Tex. Crim. App. 1995). The trial court may choose to believe or disbelieve any witness's testimony in whole or in part. *Hernandez v. State*, 538 S.W.2d 127, 131 (Tex. Crim. App. 1976).

The State is required to prove beyond a reasonable doubt that the defendant is the person who committed the charged crime. *See Johnson v. State*, 673 S.W.2d 190, 196 (Tex. Crim. App. 1984); *Jones v. State*, 458 S.W.3d 625, 630 (Tex. App.—Houston [1st Dist.] 2015, pet. ref'd). It may do so by either direct or circumstantial evidence, coupled with all reasonable inferences from that evidence. *Gardner v. State*, 306 S.W.3d 274, 285 (Tex. Crim. App. 2009); *Stubblefield v. State*, No. 01-16-00644-CR, 2017 WL 2645040, at *3 (Tex. App.—Houston [1st

Dist.] June 20, 2017, no pet.) (mem. op., not designated for publication). In determining whether the State presented sufficient evidence to carry this burden, we must consider "the combined and cumulative force" of all the identity evidence in the light most favorable to the trial court's finding. *See Merritt v. State*, 368 S.W.3d 516, 526 (Tex. Crim. App. 2012); *Robertson v. State*, No. 14-17-00446-CR, 2018 WL 4571895, at *3 (Tex. App.—Houston [14th Dist.] Sept. 25, 2018), pet. ref'd, untimely filed) (mem. op., not designated for publication).

## B.    Analysis

X.D. challenges the sufficiency of the evidence identifying him as the perpetrator of the arson. As noted, in addition to testifying at trial that X.D. started the fire, both I.R. and M.R. identified X.D. in their written statements as well as from a photo array. X.D. argues that this evidence was insufficient to show that he was the offender because I.R. and M.R. "gave a good deal of conflicting testimony" and Allison Ward, X.D.'s teacher, testified that he was in her classroom when the fire alarm sounded.

With regard to I.R.'s and M.R.'s testimony, X.D. identifies the following "conflicts":

- I.R. testified that she and M.R. walked to the classroom from the bathroom, but M.R. testified that they ran back to the classroom.

- M.R. at first testified that she was outside the boys' bathroom with I.R., but after reading her statement, she testified that G. and his friends were also there.

12

- At trial, I.R. stated that one of the boys was J.M. but in her statement, she wrote that X.D. was the one who started the fire.

- I.R. testified at first that one boy had a lighter and the other had paper and that the boys were behind something, but she later testified that the boys were lighting something on fire.

- M.R. testified at first that she saw one boy with a lighter and could not remember what the other boy was doing, but she later testified that one boy had the lighter and the paper.

We note at the outset that many of these examples are not fairly characterized as "conflicts" when read in the context of the questions asked and the entirety of each witness's testimony. But to the extent that there are inconsistencies within each witness's testimony and statements, or conflicts between the two witnesses' accounts of the events, such discrepancies "do not destroy that testimony as a matter of law." *Lipscomb v. State*, 526 S.W.3d 646, 651 (Tex. App.—Houston [1st Dist.] 2017, pet. ref'd) (citing *McDonald v. State*, 462 S.W.2d 40, 41 (Tex. Crim. App. 1970) ("The fact that a witness makes contradictory or inconsistent statements does not destroy his testimony as a matter of law.")). Instead, we resolve any discrepancies in the witnesses' testimony in favor of the verdict. *Thomas v. State*, 444 S.W.3d 4, 8 (Tex. Crim. App. 2014); *see also Wesbrook v. State*, 29 S.W.3d 103, 111 (Tex. Crim. App. 2000) (stating that because factfinder is sole judge of witnesses' credibility and of weight given to their testimony, it is exclusive province of factfinder to reconcile conflicts in evidence); *Herrera v.*

13

*State*, 526 S.W.3d 800, 808 (Tex. App.—Houston [1st Dist.] 2017, pet. ref'd) (stating that factfinder "alone must reconcile any conflicts in the evidence"). We therefore defer to the trial court's resolution of any conflicts in the witnesses' testimony.

X.D. also argues that I.R. and M.R. "lied" in their testimony. For example, he points out that I.R. testified that, for her written statement, M.R. told her what to write down for the color of the paper. Again, a review of I.R.'s testimony in its entirety does not necessarily bear this out. I.R. testified that she did remember the color of the paper after M.R. reminded her it was purple. Similarly, X.D. argues that I.R. "admitted that she lied" when she told prosecutors in an interview that she had seen four boys in the bathroom at the time of the fire. On cross-examination, the following exchange occurred:

| [X.D.'s counsel]: | When you talked with the DAs, you actually said there were four boys that were in the bathroom at the time, right?" |
| --- | --- |
| [I.R.]: | Yes. |
| [X.D.'s counsel]: | Is that a truth or is that a lie? |
| [I.R.]: | A lie. |
| [X.D.'s counsel]: | That was a lie? |
| [I.R.]: | Yes. I don't remember putting that there [were] four boys. |
| [X.D.'s counsel]: | So that's something you didn't tell the DAs? |

| [I.R.]: | No. |

. . . .

| [X.D.'s counsel]: | And just so I'm clear, so are you saying there [were] definitely only two boys in the bathroom or you just don't remember there being more than that? |
| [I.R.]: | I don't remember being more than that. |

X.D.'s characterization of this testimony as I.R. "admitting she lied" to prosecutors is only one interpretation. Alternatively, in answering the question whether "that" is "a truth" or "a lie," I.R. may have been referring to the prosecutors' statement that she told them there were four boys instead of two.

X.D. also points out that I.R. and M.R. wrote about fire crackers in their statements but admitted at trial either that they did not remember fire crackers or that there were none and that M.R. testified that I.R. wanted her to lie to get the reward. We presume by referencing all of the above testimony, X.D. is arguing that the identification evidence is insufficient because I.R. and M.R. were not credible witnesses. But witness credibility is solely within the province of the trier of fact who evaluates demeanor and credibility. *See Thomas*, 444 S.W.3d at 8; *Cain v. State*, 958 S.W.2d 404, 408–09 (Tex. Crim. App. 1997) ("What weight to give contradictory testimonial evidence is within the sole province of the [factfinder] because it turns on an evaluation of credibility and demeanor."); *see also Herrera*, 526 S.W.3d at 808 (stating that factfinder "may choose to believe all, some, or

15

none of a witness's testimony"). We therefore defer to the trial court regarding the credibility of I.R.'s and M.R.'s testimony.

In stating in his brief that I.R. "stated that she was 'pretty sure,' but not 100% sure, as to who started the fire when she identified in the photo line-up," X.D. also appears to challenge I.R.'s identification of him from the photo array. But I.R. identified X.D. by name at trial as well as in her written statements, as did M.R., who wrote on her photo lineup form that she was "100% sure it is [X.D.]." This evidence is sufficient to identify X.D. as one of the students who started the fire. *See Merritt*, 368 S.W.3d at 526 (holding that appellate court must consider "combined and cumulative force" of all evidence in light most favorable to trial court's finding in reviewing sufficiency of identity evidence).

Finally, we turn to X.D.'s contention that Ward's testimony makes it "highly improbable" that he could have started the fire. Ward testified that it takes "a minute or two" to walk from the boys' bathroom to her classroom, and that X.D. was in her classroom when the fire alarm sounded. This testimony does not foreclose the possibility that, after setting the fire, X.D. could have made it to the classroom before the fire alarm sounded; nothing in the record shows how long it took X.D. to get to the classroom (whether he walked or ran), or how long it took for the fire alarm to sound after the fire started.

In sum, the trial court was fully entitled to believe I.R.'s and M.R.'s version of events to conclude beyond a reasonable doubt that X.D. perpetrated the arson.

We overrule X.D.'s first issue.

## Admission of Identification Evidence

In his second issue, X.D. argues that the photo array evidence—consisting of the photo array, M.R.'s photo lineup form, and I.R.'s photo lineup form—should not have been admitted because it was so impermissibly suggestive that it gave rise to a substantial likelihood of misidentification.

## A.     Standard of Review and Applicable Law

A pretrial identification procedure may be so suggestive and conducive to mistaken identification that later use of that identification at trial would deny the accused due process of the law. *Conner v. State*, 67 S.W.3d 192, 200 (Tex. Crim. App. 2001); *Barley v. State*, 906 S.W.2d 27, 32–33 (Tex. Crim. App. 1995). We review de novo whether an identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of misidentification, but we review historical issues of fact in the light most favorable to the trial court's ruling. *Fisher v. State*, 525 S.W.3d 759, 762 (Tex. App.—Houston [14th Dist.] 2017, pet. ref'd) (citing *Loserth v. State*, 963 S.W.2d 770, 773–74 (Tex. Crim. App. 1998)).

A pre-trial identification procedure may be impermissibly suggestive based on the manner in which it was conducted or the content of the photo array. *Barley*, 906 S.W.2d at 33; *Villareal v. State*, No. 01-17-00234-CR, 2018 WL 4134994, at *7 (Tex. App.—Houston [1st Dist.] Aug. 30, 2018, no pet.) (mem. op., not designated for publication). For example, suggestiveness in the conduct of the pretrial identification procedure may be created by police pointing out the suspect or suggesting that a suspect is included in the photo array. *Burkett v. State*, 127 S.W.3d 83, 87 (Tex. App.—Houston [1st Dist.] 2003, no pet.) (citing *Barley*, 906 S.W.2d at 33). Or the content of a photo array itself may be suggestive if the suspect is the only individual who closely resembles the description given by the witness. *Id.*

Once a pre-trial identification procedure is found to have been impermissibly suggestive, the court must determine whether the suggestive procedure gave rise to a very substantial likelihood of irreparable misidentification. *Balderas v. State*, 517 S.W.3d 756, 796 (Tex. Crim. App. 2016); *Thomas v. State*, 470 S.W.3d 577, 589 (Tex. App.—Houston [1st Dist.] 2015), *aff'd*, 505 S.W.3d 916 (Tex. Crim. App. 2016). The defendant bears the burden of showing by clear and convincing evidence both impermissible suggestion and a substantial likelihood of misidentification. *See Barley*, 906 S.W.2d at 33–34; *see also Gorden v. State*, No. 01-16-00088-CR, 2016 WL 6803354, at *5 (Tex. App.—Houston [1st

18

Dist.] Nov. 17, 2016, pet. ref'd) (mem. op., not designated for publication). And "[a]n analysis under these steps requires an examination of the 'totality of the circumstances' surrounding the particular case and a determination of the reliability of the identification." *Santiago v. State*, 425 S.W.3d 437, 440 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd) (citing *Barley*, 906 S.W.2d at 33).

Reliability is the "linchpin" in determining admissibility of identification testimony. *Nunez-Marquez v. State*, 501 S.W.3d 226, 237 (Tex. App.—Houston [1st Dist.] 2016, pet. ref'd) (quoting *Burkett*, 127 S.W.3d at 86). Thus, even if the pretrial procedure is found to be impermissibly suggestive, the identification testimony is still admissible if the indicia of reliability outweigh the suggestiveness, such that there is not a substantial likelihood of irreparable misidentification. *Id.*

## B. Analysis

X.D. argues that the photo array was impermissibly suggestive because (1) it was administered by a school official instead of by law enforcement personnel, and (2) two of the seven photos in the array were of other "possible suspects."

We first address the State's argument that X.D. forfeited this issue because it does not comport with his counsel's trial objection. To preserve error for appellate review, the Texas Rules of Appellate Procedure require that the record show that the objection "stated the grounds for the ruling that the complaining party sought

from the trial court with sufficient specificity to make the trial court aware of the complaint, unless the specific grounds were apparent from the context." TEX. R. APP. P. 33.1(a)(1)(A). If the issue on appeal does not comport with the objection made at trial, the error is forfeited. *Clark v. State*, 365 S.W.3d 333, 339 (Tex. Crim. App. 2012).

The State offered the photo array evidence through Officer Provencio after asking him to explain how he prepared the photo array. Provencio testified that the array consisted of seven of the school's former and current students, and that he made sure that each of the photos had at least some similarities with X.D. and J.M. He chose seven people because that number was standard for photo arrays. He put "both the possible suspects" in the array because he thought that the "possibility of them picking one and not the other just made it a lot harder," and he included A.G., who had been rumored to have been involved in the incident, only after determining that A.G. was not involved. Provencio further testified that he asked assistant principal Brown to conduct the identification procedure because he believed I.R. and M.R. would be more comfortable with someone they knew.

The State then offered the photo array evidence, and X.D.'s counsel objected as follows:

> I'm going to object, Your Honor. They're improper photo lineups. They weren't done correctly. They're not supposed to have seven people. You're not supposed to have multiple

20

> people in the same lineup. So I'm going to object to anything as far as the photo lineup goes.

The State argues that this objection does not state that the photo arrays were impermissibly suggestive, nor can such an argument be ascertained by considering the context in which the objection was made.

"[A] party need not state his objection with specificity in order to preserve error so long as the record otherwise makes it clear that both the trial court and the opposing party understood the legal basis." *Thomas v. State*, 408 S.W.3d 877, 884 (Tex. Crim. App. 2013); *see also Zillender v. State*, 557 S.W.2d 515, 517 (Tex. Crim. App. 1977) ("[W]here the correct ground of exclusion was obvious to the judge and opposing counsel, no waiver results from a general or imprecise objection."). This is because "the reason that any objection must be specific in the first place is so that the trial court can avoid the error or provide a timely and appropriate remedy, and the opposing party has an opportunity to respond and, if necessary, react." *Thomas*, 408 S.W.3d at 884. Thus, if the record on appeal shows that these policies have been satisfied, "it should not matter to the appellate court whether the objecting party used a particular 'form of words'—or any particular words at all, if meaning is adequately conveyed by context." *Id.* at 884–85 (citing *State v. Rosseau*, 396 S.W.3d 550, 555 (Tex. Crim. App. 2013) ("Rather than focus on the presence of magic language, a court should examine the record to determine whether the trial court understood the basis of a defendant's request.")).

21

Nothing in X.D.'s counsel's trial objection put the court or the State on notice of his complaint that the photo array evidence was administered by a school official instead of law enforcement. We therefore hold that X.D. forfeited this argument for appellate review. *See Moore v. State*, No. 14-08-00146-CR, 2009 WL 1416075, at *8 (Tex. App.—Houston [14th Dist.] May 21, 2009, pet. ref'd) (mem. op., not designated for publication) (holding that appellant preserved argument that he had different hair length than others in array, but not that he was only person with oblong face, where his sole argument in trial court was that only one other man in photo array had similar skin tone to appellant but had different hair length than appellant); *Reynolds v. State*, No. 05-05-01601-CR, 2006 WL 3742898, at *1 (Tex. App.—Dallas Dec. 21, 2006, no pet.) (mem. op., not designated for publication) (holding argument that photo array was impermissibly suggestive because police officer conveyed that man whose prints matched those found in car was in photo array was not preserved for appeal when that argument was not presented in trial court; stating that only objections made in trial court were based on "similarities between two photos, the incident took place at night, and the degree of illumination was unclear"; and holding that "only objection presented to the trial court and now raised on appeal is the similarities of the two photos. Thus, this is the only argument properly presented to this Court for review").

But X.D. did not forfeit his argument that the inclusion of photos of J.M. and A.G. rendered the photo array impermissibly suggestive. Here, given Officer Provencio's testimony just before the State offered the photo array evidence, it is clear that "[y]ou're not supposed to have multiple people in the same lineup" was an objection that the inclusion of J.M. and A.G. in the photo array made it impermissibly suggestive. *See Clark*, 365 S.W.3d at 339 ("In determining whether a complaint on appeal comports with a complaint made at trial, we look to the context of the objection and the shared understanding of the parties at the time."). We therefore consider this argument.

To amount to the level of impermissible suggestiveness necessary to require reversal, the photographic identification procedure must in some way be so defective as to indicate or suggest the photograph that the witness is to identify. *Ward v. State*, 474 S.W.2d 471, 475 (Tex. Crim. App. 1971); *Aviles-Barroso v. State*, 477 S.W.3d 363, 381 (Tex. App.—Houston [14th Dist.] 2015, pet. ref'd). X.D. does not cite any authority supporting his argument that the inclusion of two other potential suspects rendered the array impermissibly suggestive. And this argument is unlike any other we have found. As we understand it, it is X.D.'s position that the probability that the witnesses would select "a" potential suspect was increased by including J.M. and A.G., two additional suspects, in the array. While this is true, it did not increase X.D.'s individual odds of being selected. We

conclude that X.D. has not shown by clear and convincing evidence that the photo array was impermissibly suggestive. *See Barley*, 906 S.W.2d at 33–34.

We overrule X.D.'s second issue.

## Conclusion

We affirm the judgment of the trial court.


Evelyn V. Keyes
Justice

Panel consists of Justices Keyes, Kelly, and Goodman.